UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NETWORK ACQUISITION PARTNERSHIP ALLIANCE, LLC, a Texas limited liability company, | No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| CES PROPERTIES, INC., a Washington corporation; and CHARLES EDWARD SPRINGMAN and JANE HAGUE, and their marital community, | **JURY DEMAND** |
| Defendants. | |

Plaintiff, Network Acquisition Partnership Alliance, LLC ("**NAPA**"), alleges as follows:

## I.      PARTIES

1.      NAPA is a Texas limited liability company all of whose members are citizens of Texas.

2.      CES Properties, Inc. ("**CES**") is a Washington corporation with its principal place of business in King County, Washington.

COMPLAINT - 1

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745

3.      Charles Edward Springman ("**Springman**") and Jane Hague are residents of King County and citizens of the State of Washington.  Ed Springman and Jane Hague were, at all times material to this complaint, husband and wife, and constituted a marital community under the laws of the State of Washington.  All acts and omissions alleged on the part of Springman were for and on behalf of their marital community.

## II.      JURISDICTION & VENUE

4.      The United States District Court has original jurisdiction to hear this action pursuant to 28 U.S.C. §§ 1331 and 1332, and exclusive jurisdiction under 15 U.S.C. § 78aa.  The amount in controversy is based upon the amount of money paid for the stock that is the subject this suit, which is in excess of $75,000.00 and into the seven figures.  The Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 78aa because the Defendants reside in the Western District of Washington and a substantial part of the events giving rise to NAPA's claims arose in this District.

## III.      FACTUAL ALLEGATIONS

6.      Springman is the sole shareholder of CES.  Springman is and was at all relevant times a "control person" of CES within the meaning of 15 U.S.C. § 78t, Tex. Rev. Civ. Stat. art. 581-33(F), and the Securities Act of Washington, RCW 21.20.

7.      Prior to July 15, 2016, CES was the sole shareholder of Sherron Associates, Inc. n/k/a Place 10 Residential, Inc. ("**Sherron**").  The business of Sherron was multi-family property management.  Thus, Sherron derived its income almost exclusively from the management of apartment complexes and some other developed real estate (an office

COMPLAINT - 2

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745

building and storage center) owned by entities that Springman represented he solely controlled.  These entities and Property Management Agreements are further described below.

8.      On July 1, 2000, Sherron entered a property management agreement with NAP/Springman Fund XI (Fairwood) LLC to manage the Fairwood apartment complex.  The agreement was signed for by NAP/Springman Fund (Fairwood) XI by Springman as president of CES, the managing member of the LLC, and by Springman as president of Sherron.

9.      In October 1985, Sherron entered a property management agreement with Cascadian Associates to manage the Cascadian apartment complex.  The agreement was signed for by Springman as president of CES, the managing general partner of the LLC, and by Springman as president of Sherron.

10.      In February 1999, Sherron entered a property management agreement with NAP/Springman Fund XI (Place 10) LLC to manage the Fund XI's apartment complex.  The agreement was signed for by NAP/Springman Fund (Place 10) LLC by Springman as president of CES, the manager of the LLC, and by Springman as president of Sherron.

11.      On October 1, 1988, Sherron entered a property management agreement with Highlander Associates to manage the Highlander apartment complex.  The agreement was signed for by Springman as president of CES, the managing general partner of the LLC, and by Springman as president of Sherron.

12.      In November 2000, Sherron entered a property management agreement with Belmont/Republican Associates, LLC to manage the Belmont apartment complex.  The agreement was signed for by Springman as president of CES, the manager of the LLC, and by Springman as president of Sherron.

COMPLAINT - 3

13.     On May 10, 2000, Sherron entered a property management agreement with Guardian Self Storage Associates, LLC to manage Guardian's storage facility.  The agreement was signed for by Springman as president of CES, the manager of the LLC, and by Springman as president of Sherron.

14.     Each of the property management agreements for these six entities (collectively referred to herein as the "**Property Management Agreements**") are identical in all material respects, aside from the name of the counter-party property owner.  Indeed, for each of the Property Management Agreements, Springman signed on behalf of both Sherron and the counter-party property owner.  At this and all relevant times, these six Property Management Agreements generated over 40% of the revenues that Sherron generated.

15.     Beginning as early as the summer of 2015, and prior to July 15, 2016, Springman, on behalf of himself and CES, began negotiations with NAPA (through its representatives Glenn Gonzales and Shravan Parsi) regarding the purchase and sale of all outstanding stock of Sherron.

16.     During negotiations, Springman, on behalf of himself and CES, provided NAPA with documents that NAPA reviewed and relied upon during its due diligence, including but not limited to: (1) several revised versions of financial statements for Sherron; and (2) the Property Management Agreements between Sherron, as the property manager, and various entities that Springman repeatedly represented he solely controlled, as the counter-party property owner.

17.     Springman provided financial statements multiple times during the period from the summer of 2015 until prior to July 15, 2016, by emails directed to NAPA's representative who was located in Texas.  Despite the numerous iterations, the last financial statements that

COMPLAINT - 4

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745

Defendants provided contained material inaccuracies and omissions.  NAPA relied upon these financial statements in electing to purchase the Sherron stock, and in continuing to make payments towards the purchase price, and in closing on the sale of the Sherron stock.

18.    For example, Defendants failed to disclose the financial statements: (1) were based upon a cash basis rather than accrual basis; (2) reflected material amounts of monthly property management revenues that were not earned during such months but instead were revenues from prior months (as the person controlling both Sherron and the property management clients, Springman, was able to manipulate when such revenues were recognized on the financial statements); and (3) did not disclose the existence of at least one personal injury claim seeking in excess of $1 million that subsequently resulted in the initiation of a recently settled lawsuit against Sherron (the "**Ayraud Claim**") styled and numbered *Ayraud v. Piccadilly II Associates, et al.*; Cause No. 2016CV33775; in the District Court, Denver County, Colorado.

19.    By using a cash basis and manipulating the months during which revenues and corresponding expenses were recognized (even though these months were different than the dates the revenues were earned), Defendants caused the financial statements to be misleading in that it appeared that Sherron was more profitable – and thus more valuable – than in fact Sherron was at that time.  In addition, these financial statements failed to disclose that Sherron's customers were not timely paying amounts due under the Property Management Agreements, which was material information in and of itself.

20.    During negotiations, NAPA expressed concern because the Property Management Agreements, on their face, indicated the counter-party property owners had the ability to terminate the contracts for convenience on short notice.  Because these contracts

COMPLAINT - 5

generated over 40% of the revenue for Sherron (and thus were a primary driver of the value that NAPA would obtain by purchasing the stock of Sherron), NAPA informed Springman that NAPA could not purchase the Sherron stock at the price that Defendants were proposing.

21.     In response, Springman, on behalf of himself and CES, assured NAPA that the termination provisions were illusory and were not a risk because Springman solely controlled the counter-party property owners.  As such, Springman represented he had the exclusive right and ability to activate the termination provision, which was false (while Springman does control certain of the counter-party property owners, Springman's son claims to control at least two of them).  Springman represented that so long as the entities (that he solely controlled) continued to own the managed properties, then Springman would keep the Property Management Agreements in place with Sherron.

22.     Springman made these representations many times during the period from the summer of 2015 until July 15, 2016 and thereafter, including but not limited to during: (1) telephone calls with NAPA's representative who was located in Texas at the time; and (2) in-person meetings with NAPA's representative while in Washington and Utah.  NAPA relied upon these representations in electing to purchase the Sherron stock, and in continuing to make payments towards the purchase price, and in closing on the sale of the Sherron stock.

23.     During negotiations, material misrepresentations and omissions were made by Springman and CES.  Material issues for which misrepresentations were made and for which necessary information was not disclosed include but are not limited to: (1) the contractual right of the counter-party property owners to terminate the Property Management Agreements for convenience on short-notice, despite Springman's assurances to the contrary that he alone controlled the decision to terminate; (2) that the Springman-controlled Sherron had failed to

COMPLAINT - 6

comply with applicable employment laws, which placed Sherron in substantial jeopardy of litigation costs and undisclosed liabilities; (3) that the rent for Sherron's office space lease, which was with an entity controlled by Springman, could be increased at the whim of Springman; (4) the existence and scope of the employment claims; (5) that the financial statements were misleading because of the manner in which they were prepared, including the fact that the data reflected revenues in periods Springman was arbitrarily selecting by controlling when the counter-party property owners paid property management fees (and thus recognize revenue); and (6) at a minimum, Sherron's customers were not timely paying the amounts due under the Property Management Agreements.

24.     The risk associated with the termination provisions of the Property Management Agreements was material.  Sherron's primary source of income derived from the Property Management Agreements, which generated over 40% of the gross revenues of Sherron, and thus these contracts were a material part of the actual value that NAPA would obtain by purchasing the stock of Sherron.  If these contracts were terminated, then: (1) Sherron's gross revenue and ultimately profits would be substantially reduced; and (2) the Sherron stock would be worth substantially less than the amount that NAPA paid CES. Notwithstanding, CES and Springman failed to disclose this risk to NAPA and instead falsely represented to NAPA that this issue did not present any actual risk to NAPA because Springman controlled the counter-party property owners.  Later, Defendants purported to terminate the Property Management Agreements, and then improperly obtained temporary injunctive relief in state court to prevent Sherron from performing under the Property Management Agreements.  Ultimately, Defendants transferred the management agreements

COMPLAINT - 7

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745

over to a company that is connected to the Defendants, which they staffed with many former

employees of Sherron.

25.    The risk associated with Sherron's failure to comply with applicable

employment laws was material.  Failure to comply with these laws placed Sherron in

substantial jeopardy of litigation costs and undisclosed liabilities.  This risk materialized when

a former employee initiated the civil action styled and numbered *Bray v. Sherron*

*Associates, Inc*.; Case No. 17-2-09757-8 SEA; in the Superior Court for the State of

Washington, King County.

26.    The risk associated with the rental rate for Sherron's office lease was material.

The purchase price for the Sherron stock was determined from Sherron's historical profit,

which in turn was determined based in part on a static rental rate for the lease space.  If the

rental rates could be raised arbitrarily, then the profits of Sherron would be substantially

reduced, and thus the value of the Sherron stock commensurately diminished.

Notwithstanding, CES and Springman failed to disclose this risk to NAPA.

27.    The risk associated with the Ayraud Claim was material.  If the plaintiff was

successful, then the Ayraud Claim would have materially impacted the value, assets, and

operational ability of Sherron.  The mere potential liability arising from the Ayraud Claim

meant the stock of Sherron was worth substantially less than the amount that NAPA paid CES

at the time of the sale, regardless of any potential indemnities, which may or may not have

provided coverage or been sufficient to cover the amount of the exposure.  Notwithstanding,

CES and Springman failed to disclose this risk to NAPA, and NAPA has been forced to

address the claim.

COMPLAINT - 8

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745

28.     The risk associated with the financial statements was material.  This risk

materialized because the current operating income from monthly operations was misleadingly

conveyed due to the method of accounting, and Defendants' failure to disclose their decisions

to defer revenue and match that revenue with corresponding expenses.  To make matters

worse, Springman still exerted influence over Sherron's employees, who had been reporting

directly to Springman.  For example, Bill Wagner remained working for Sherron as its Vice

President of Accounting following the sale, but Wagner's loyalty still lay with Springman.

Following the sale of Sherron stock, Wagner prepared and delivered financial statements that

were materially inaccurate and misleading, which helped to conceal Defendants' prior fraud

for a time.  Ultimately, Sherron terminated Wagner for performance, but Springman

demanded that Sherron pay Wagner severance by alleging that Wagner would sue Sherron for

age discrimination, which Springman himself encouraged Wagner to do.  Sherron relented,

and then Springman hired Wagner to work directly for a company connected to Springman

that competes directly with Sherron in the property management business (in fact taking

several of Sherron's employees and long-time clients that Springman and his son control).

Based upon a non-misleading portrayal of the current operating income from monthly

operations (current revenues matched against current expenses that were incurred to generate

such current revenues), the value of the Sherron stock was materially less than what NAPA

agreed to pay Defendants.

29.     The foregoing misrepresentations and omissions of fact were material in that

they would be viewed by a reasonable investor as having significantly altered the total mix of

information bearing upon the decision to purchase the Sherron stock.  A reasonable investor

would find it significant that: (1) Sherron's financial statements were materially inaccurate in

COMPLAINT - 9

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745

that they failed to identify the accounting basis and misleadingly portrayed monthly revenues, corresponding expenses, and resulting profits; did not disclose the risk that Springman had controlled and could arbitrarily raise operating expenses; and did not completely disclose its liabilities; (2) Sherron's customers were not timely paying amounts due under the Property Management Agreements; and (3) despite Springman's assurances that the Property Management Agreements would be kept in place and thus did not pose any risk, Springman did not intend to honor that promise, or was prepared to breach that promise, and in at least two cases, was not even able to deliver on that promise because he did not actually control two of these property management clients.

30.     Springman, and thus CES, knew these representations were false at the time they were made because Springman had actual knowledge of the truth about the subject matters of the representations.  Likewise, Springman, and thus CES, had actual knowledge of the omitted facts during the negotiations, at all times leading up to the initiation of the transaction; while receiving payments from NAPA for the purchase price of the Sherron stock; and prior to the closing of the sale of the Sherron stock.

31.     Springman is and was at all times the sole owner of CES, and CES was at the time the sole owner of Sherron and, as such, had knowledge of all aspects of Sherron's operations and finances.  Simply put, there was no person other than Springman who could possibly know more about the actual information regarding Sherron's operations and finances.

32.     According to his biography published on his website, Springman has since 1969 been involved in property development, construction, and management of projects ranging from apartments, hotels, senior living centers, storage facilities, shopping centers,

COMPLAINT - 10

private financing, and other investment opportunities across the western United States.  This biography continues that Springman leverages his strengths of having a keenness in finding lucrative investment opportunities, solid negotiating skills, and the ability to raise capital.

33.     Springman has made a career as an investor and as a solicitor of investments from others, and thus Springman is well-familiar what information bears on investment decisions.  Springman's education and experience give rise to a strong inference that Springman, and thus CES, acted with the requisite scienter, in making these misrepresentations and in omitting to state material facts necessary in order to make other statements made, in light of the circumstances under which they were made, not misleading. In addition, the substantial compensation that CES, and thus Springman, received from the sale of the Sherron stock to NAPA also gives rise to a strong inference that Defendants acted with the requisite scienter.  Based on upon these facts, Defendants had both the motive and opportunity to commit securities fraud.  From the totality of these facts, a holistic inference is apparent that Defendants acted with some degree of intentional or conscious misconduct, or deliberate recklessness.

34.     NAPA actually and justifiably relied upon the misrepresentations and omissions in deciding to purchase the Sherron stock.  But for these misrepresentations, NAPA would not have agreed to pay the full amount that was actually paid and might not have purchased the Sherron stock at all (depending on the price).  Reliance is presumed with respect to the omissions.  In any event, NAPA might not have purchased the Sherron stock at all (depending on the price), and would not have purchased the Sherron stock at the price agreed if this information had been disclosed.

COMPLAINT - 11

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745

35.     The harm from the misrepresentations and omissions materialized when:

(1) Springman rendered the Property Management Agreements inoperative by obtaining a TRO in a Washington state court that was awarded only because Springman misled the Court at an ex parte hearing and that has since been determined to have been wrongfully sought and wrongfully obtained as Springman misled the Court; thus, it was dissolved and found to be entered in error; (2) Springman demanded payment of around $300,000 from Sherron; (3) Springman raised the office space rent such that Sherron had to relocate to new office space at considerable cost in terms of lost productivity, moving expenses, and increased rent; (4) Sherron was sued by a former employee for violations of applicable employment laws; (5) Sherron was sued in connection with personal injury claims; and (6) the financial statements proved to be materially misleading.

36.     CES, and ultimately its sole shareholder Springman, obtained substantial benefit from all of the misrepresentations and omissions of fact by obtaining payment of an amount above the actual market value of the Sherron stock, plus additional fringe benefits made directly to Springman such as ongoing compensation, insurance, free office space, equipment, and personnel, and other perks.  These misrepresentations and omissions were at least a substantial factor in bringing about injury to NAPA.  When the misrepresentations were disclosed, and as the concealed risks materialized, the actual value of the Sherron stock was revealed to be materially less, and NAPA has suffered substantial losses – in excess of $75,000.00 and into the seven figures – as a foreseeable result.

## IV.     CAUSES OF ACTION

37.     All conditions precedent to NAPA's recovery have occurred or have been waived, excused, or otherwise satisfied. All notices required have been provided or were

COMPLAINT - 12

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745

waived, excused, or otherwise satisfied.  NAPA repeats and incorporates the allegations set forth in Articles I, II, III, and V.

### A.   VIOLATIONS OF 15 U.S.C. §§ 78A, ET SEQ., & RELATED RULES & REGULATIONS

38.     NAPA realleges and incorporates by reference each and every allegation set forth above.

39.     The Sherron stock that NAPA purchased is a security within the meaning of federal securities laws, 15 U.S.C. §§ 78a, et seq.

40.     In connection with the offer and sale of the Sherron stock, CES, through Springman: (1) made untrue statements of a material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (2) engaged in an act, practice, or course of business that operated as a fraud or deceit upon NAPA.  Springman directly or indirectly controlled CES in connection with these violations.  Springman directly or indirectly committed these violations through or by means of CES.  Springman held ultimate authority over the misrepresentations and omissions, including their content and whether and how to communicate the information.

41.     Defendants are jointly and severally liable to NAPA for rescission or actual damages (out-of-pocket damages being the difference between the price paid and the true value of the Sherron stock), pre-judgment and post-judgment interest, court costs, and attorneys' fees.

### B.   VIOLATIONS OF TEX. REV. CIV. STAT. ART. 581-1, ET SEQ.

42.     NAPA realleges and incorporates by reference each and every allegation set forth above.

COMPLAINT - 13

43.     The stock of Sherron that NAPA purchased is a security within the meaning of the Texas Securities Act, Tex. Rev. Civ. Stat. art. 581-1, *et seq.* (the "**Texas Securities Act**").

44.     Defendants sold the securities to NAPA, which was formed and is headquartered in Texas, and whose members reside and are domiciled in Texas.  This sale was directed to and made in part in Texas to a Texas resident.

45.     A person who offers or sells a security by means of an untrue statement of material fact or an omission to state a material fact that is necessary in order to make the statements, in the light of the circumstances under which they are made, not misleading, is liable to the buyer for rescission or damages. There is no need to show intent, reliance, loss causation, due diligence, or that the loss could not have been avoided under the Texas Securities Act. The only required showing is of materiality.

46.     CES sold securities by means of untrue statements of material facts and/or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  The representations and omissions were material because there is an appreciable likelihood that it could have significantly affected the investment decisions of a reasonable investor, and a reasonable investor would consider such information important in deciding whether to invest.

47.     Springman controlled CES.  Springman directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aided CES in the sale of the Sherron stock.  Therefore, Springman and CES are jointly and severally liable for these claims.

COMPLAINT - 14

48.     Defendants are liable to NAPA for statutory rescission or damages, including interest. In addition, Defendants are liable for costs, attorneys' fees, and exemplary damages. NAPA also seeks recovery of post-judgment interest.

C.     **STATUTORY FRAUD (TEX. BUS. & COM. CODE § 27.01)**

49.     NAPA realleges and incorporates by reference each and every allegation set forth above.

50.     The transaction at issue here involved the sale of securities.  During this transaction, Defendants: (a) made false representations of fact, (b) made false promises; and/or (c) benefitted by not disclosing that their own or a third party's representations or promises were false.  Each of the Defendants benefitted by not disclosing the falsity of the representations and promises of the other Defendant and the Springman-controlled counter-party property owners.  Defendants made the false representations and promises for the purpose of inducing NAPA to enter the transaction.  NAPA relied upon the representations and promises, which caused NAPA injury.

51.     Defendants are jointly and severally liable to NAPA for rescission (or alternatively actual damages), exemplary damages, pre-judgment and post-judgment interest, court costs, expert witness fees, deposition fees, and attorneys' fees.

D.     **COMMON-LAW FRAUD & FRAUDULENT INDUCEMENT**

52.     NAPA realleges and incorporates by reference each and every allegation set forth above.

53.     Springman, and thus CES, made numerous false representations and promises to NAPA. Defendants also benefitted by not disclosing the falsity of the representations. Springman, and thus CES, each made these false representations or promises, or failed to

COMPLAINT - 15

make any disclosures, for the purpose of inducing NAPA to agree to and ultimately purchase the Sherron stock.

54.     Each of these representations and promises was material in that a reasonable person would attach importance to and be induced to act on the information in determining whether to enter a transaction. These representations and promises were made directly to NAPA.  NAPA relied upon these representations and promises in entering the transaction, which proximately caused NAPA injury.  Defendants either knew the representations and promises were false, or made the representation recklessly, as a positive assertion, and without knowledge of the truth.  Defendants did this with the intent that NAPA act upon the same.  NAPA did in fact actually and justifiably rely upon them, which caused NAPA injury.

55.     Defendants failed to disclose information to NAPA.  Defendants had a duty to disclose this information to NAPA because: (1) they discovered new information that made their earlier representations misleading or untrue; (2) they created a false impression by making a partial disclosure; and/or (3) they voluntarily disclosed some information and therefore had a duty to disclose the whole truth.  Defendants knew NAPA did not know this information and did not have an equal opportunity to discover this information.  Defendants deliberately failed to inform NAPA of these facts, and in so doing intended to induce NAPA into taking some action or refraining to act.  NAPA was injured as a result of acting without knowledge of these facts.

56.     Each of these omissions was material in that a reasonable person would have considered the omitted information important in deciding the course of action to take.  Reliance is presumed since a reasonable investor would have considered this information

COMPLAINT - 16

important in deciding whether to invest.  NAPA actually and justifiably relied on this information in that it would not have invested had it known the truth.

57.     Defendants are jointly and severally liable to NAPA for rescission or alternatively actual damages (benefit of the bargain damages, or out-of-pocket losses), exemplary damages, pre- and post-judgment interest, and court costs.

### E.     VIOLATIONS OF SECURITIES ACT OF WASHINGTON

58.     NAPA realleges and incorporates by reference each and every allegation set forth above.

59.     The stock of Sherron that NAPA purchased is a security within the meaning of the Securities Act of the State of Washington, RCW Ch. 21.20 (the "**Securities Act of Washington**").

60.     A person who offers or sells a security by means of an untrue statement of material fact or an omission to state a material fact that is necessary in order to make the statements, in the light of the circumstances under which they are made, not misleading, is liable to the buyer for rescission or damages.

61.     CES sold securities by means of untrue statements of material facts and/or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  The representations and omissions were material because there is an appreciable likelihood that it could have significantly affected the investment decisions of a reasonable investor, and a reasonable investor would consider such information important in deciding whether to invest.

62.     Springman controlled CES.  Springman directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aided CES in

COMPLAINT - 17

the sale of the Sherron stock.  Therefore, Springman and CES are jointly and severally liable for these claims.

63.     In addition, the securities sold by Defendants CES and Springman were not registered pursuant to the Securities Act of the State of Washington, RCW Ch. 21.20.

64.     Defendants, by their own acts, misrepresentations, and omissions alleged herein, violated the Securities Act of Washington.

65.     The Securities Act of Washington, provides in RCW 21.20.430 that any person who offers or sells a security in violation of RCW 21.20.010, 21.20.140, or 21.20.430 shall be liable to the person buying the security for damages, plus costs, reasonable attorneys' fees and interest.  The Act, RCW 21.20.430, further provides for rescission of transactions in violation of the Act, including return of the full purchase amounts, together with interest at 8% (eight percent) per annum from the date of each purchase until payment.

66.     Defendants' violations of the Securities Act of Washington have proximately caused NAPA to be damaged in an amount to be proven at time of trial.  NAPA has incurred and will continue to incur substantial attorneys' fees in the prosecution of this action.

F.     **NEGLIGENT MISREPRESENTATION**

67.     NAPA realleges and incorporates by reference each and every allegation set forth above.

68.     Defendants, by their acts and omissions alleged herein, negligently or intentionally made false representations and omissions of fact, which induced Plaintiff to invest in the master recordings through defendants.

69.     Defendants' negligent misrepresentations and omissions proximately caused damages to Plaintiff in an amount to be proven at trial.

COMPLAINT - 18

## V.      THEORIES OF LIABILITY

70.      **Direct Actor Liability**.  Springman made material misrepresentations and omissions in connection with CES's sale of Sherron stock. Therefore, Springman is jointly and severally liable with CES because a corporate actor is personally liable for tortious conduct even if committed while acting on behalf of the entity.

71.      **Respondeat Superior/Vice-Principal**.  Springman is and was acting in the course and scope of his employment and agency with CES at the time the misrepresentations and omissions were made.  Therefore, CES and Springman are jointly and severally liable.

72.      **Beneficiary of Fraud & Ratification**.  Defendants each knowingly benefitted from the fraud of one another and adopted the misrepresentations as their own.  Therefore, Defendants are jointly and severally liable.

## VI.      PRAYER

Wherefore, NAPA respectfully prays for joint and several judgment and relief against Defendants as follows:

1.      For an award of damages in excess of $75,000, the exact amount to be proven at trial;

2.      For an award of exemplary damages under Texas law;

3.      For an award of Plaintiff's reasonable attorneys' fees pursuant to the statutes cited above;

4.      For an award of pre- and post-judgment interest;

5.      For an award of Plaintiff's costs and disbursements to be taxed herein; and

6.      For such other and relief as the Court deems may deem just and proper.

COMPLAINT - 19

1

Dated this 25th day of October, 2017.

2

HILLIS CLARK MARTIN & PETERSON P.S.

3

4

By    s/Eric D. Lansverk
           Eric D. Lansverk, WSBA #17218

5

           Alexander M. Wu, WSBA #40649
           999 Third Avenue, Suite 4600

6

           Seattle, WA  98104
           Tel: (206) 623-1745

7

           Fax: (206) 623-7789
           E-mail:  eric.lansverk@hcmp.com

8

           Alex.Wu@hcmp.com

9

Attorneys for Plaintiff

ND: 22450.003 4828-5496-0721v2

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 20